M.D. in his official capacity as the Acting Commissioner of the Food and Drug Administration. Mr. Milstein for the Appellant, Mr. Sandberg for the Affiliate. May it please the Court, good morning, Your Honors. I represent the Center for Responsible Science. Among other things, their directive is essentially to protect human subjects, to make sure that they're fully informed. There was an incident where they filed a petition with the FDA to essentially assert in informed consent documents a position that the FDA itself agrees with. That is, that animal studies are not necessarily a good predictor of either safety or efficacy. So the question is whether the Center has standing. If we leave aside this policy advocacy position, the law is fairly clear as to standing. You have to show causation, and you have to show that the remedy would be such. And to focus on the injury in fact, essentially there's two questions. Is there a direct conflict between what the agency did and the mission of the organization? The answer to that is pretty obvious that there is. Why? What's the direct conflict here? The direct conflict is... They require legally sufficient notice. Excuse me? They require legally sufficient notice. The direct conflict is that it was arbitrary and capricious to say, no, we're not going to include in informed consent documents, and there are regulations that essentially set out what should be in informed consent documents. There's very critical information, that is, that animal studies are not... Are they? They're not. All right, so how's it a direct conflict? We're just saying we don't think across the board we're going to require it. How's that a conflict? It's a conflict because if they don't require it, it's not done. Now what happened is afterwards, as soon as it was denied, the Center started collating the names of principal investigators and sponsors. You say as soon as. What does the record show as to when you actually started the process of collecting that information so you could contact researchers immediately? All your complaint says is subsequent to the denial. What the complaint says is that May 10th, they started to contact principal investigators and sponsors, and at least one of whom said, okay, we'll make the change. Yes, but so when did you start this effort to compile this information? Where's that in your complaint? It's in the... I believe it's in... All it says is subsequent to. It's in the complaint that, I think it was in the paragraphs 180 to 214, I believe, that after the denial, Tammy... After the denial is a long time. Today is after the denial. No. The petition was filed and three years later there was a denial. I think the complaint says almost immediately thereafter. If you can show me where the complaint says almost immediately thereafter, that would be helpful. It says that she began to collate. I don't think it has the exact date in there. No, no, tell me what paragraph you're referring to. It was well before May 10th. It was well before May 10th. I'm going to ask this again. Really, if you could point me to the paragraph you're referring to, that would be helpful. I believe it's appendix 055 is the complaint. I'm sorry, I didn't hear. Which page? It's appendix 055, I believe, and then it's in the complaint, I believe it's paragraphs 180, beginning with 180. I'm trying to find where you said. And then there's the affidavit of... In the complaint, where does it say? When? Tamard Wright's affidavit says paragraph 29. I didn't see anything in the complaint. In the affidavit, it said subsequent to FDA's denial of petition. She began... I began compiling. Right, so I think that's what you're talking about, began compiling this information. Right. Subsequent to when? Subsequent to, it could be May 9th? Well, it's not on the record. Right. Well, don't you have to establish that to show that this injury existed at the time you filed your first complaint? The time you initiated this action? Well, there's no question that the center devoted significant resources as a result of the denial to essentially try to inform sponsors and PIs. There may be no question. The question is, had you devoted those... Because you started, initially you said we devoted all this information to collecting statistics about who died, but you agree that that is not a basis for... Correct. That's right. That was done both before and during. Right. And then there's the argument about we collected this information and started making sort of phone calls and notifying people. The phone call started May 10th. The phone call started May 10th. In order to collect the information, it's obviously sometime before May 10th. Right, which could be May 9th. Well, it could be, but we're talking about thousands of clinical trials. If you haven't put it here, can you tell us when that process started? It's not in the record, Your Honor. Right. So, I don't think I can represent... Doesn't it need to be in the record? I don't think it does. That it started at least before you filed your first complaint? Before we filed the... First complaint? Before you started the action. You have to have standing at the time you start the action. Correct. Isn't it your burden to establish that you had this injury, that you started expending those funds at the time you started the action? Well, I think if the allegations taken in the complaint are deemed true, you know, I don't think... There's no allegation about timing in there. Well... We don't deem... We don't invent facts from jurisdiction. No, we don't. But, you know, for her to say that beginning on May 10th that I started to collate... Where's that in the complaint? No, in the affidavit it says, you know... I can deem it true that she started making phone calls on May 10th, and I can deem it true that subsequent to the denial of the petition, they started collecting this information, neither of which I can infer as much as I want. But I still can find no factual basis for inferring that that collection of information started on the date of your first complaint. It's not in the record. I'm going to concede it's not in the record. But, again, they file a complaint in order to get this done. I mean, they file a petition in order to get it done. The petition is denied. She's collating at that point in time all the records of deaths and serious adverse injuries. As soon as it's denied, she says, or subsequent to its denial, she starts collating... Correct. Subsequent to is very different from as soon as. Correct. Subsequent to the denial, she starts collating the names and addresses. That obviously takes some time. Then on May 10th, she starts contacting them, which is two weeks after the essentially dismissal of the second amendment. So your position is that the response to the denial and the fact that that burdened the center is enough to get it standing? You're not really contesting that it was burdened in doing the activity beforehand, hoped the government would obviate some of that burden. The government didn't. Therefore, the burden continued. Your position is that you believe that the government was legally obligated to notify people about the limitations of animal testing, to notify research subjects, human research subjects, of the limitations of animal testing, and that when it didn't, that caused a substantial burden on the organization. The one really question in the law is, in this circuit, is that there's a distinction between at the motion-to-dismiss stage and the summary judgment stage. All the key cases where... Well, under Lujan, there's a question about, is it pleading? And then at the summary judgment stage, there has to be evidence. But I think that you're not even disagreeing with Judge Millett's point, that there isn't an allegation that the outreach, the private outreach, trying to persuade principal investigators was occurring before the agency denied the petition for rulemaking, right? It was only as a result of that failure that the center has been burdened. That's your position, right? Our position is that subsequent to the denial, she started to code it, and that beginning May 10th, she started to contact it. Right. That's not in the record before. Right, but that's... That's the difference between what would happen in the motion-to-dismiss stage and the summary judgment stage. It depends on whether, as Judge Millett was saying, if the law requires that the center have been doing some activities before it filed suit that were affected or burdened by the denial of the rulemaking petition. I'm sorry, before the denial of the rulemaking petition, in order to have standing to say that the denial of the rulemaking petition actually materially harmed it. I don't think you're claiming that your allegations are fairly read to include that pre-denial activity. It's only post-denial activity that you're... After the denial of the petition, that's right. Yeah. I think it's... I would disagree with Judge Millett that it's not necessarily the time of the filing of the original complaint. It's really the filing of the amended complaint. You have to have standing at the time you initiate the action. The amended complaints can flesh out the factual basis, but they can't create standing that didn't exist at the time of the action. Well, but between the time of the original complaint and the amended complaint, we had a decision from the court that essentially said, hey, if the center has no standing, nobody has any standing. So tell us what it is you've done and how you've expended your resources. And then the affidavit is prepared. The affidavit says that subsequent to the denial, we started to collate the names. And then we started to contact people, because essentially we took over the role of the FDA to essentially inform human subjects, to inform sponsors, to inform PIs that human subjects need to be told. Does the center provide services? Several of our cases and the Supreme Court's leading case in this area, the Havens Realty case, involve organizations that provide services in the form of referrals or advice or counseling. Is there any such service that the center provides? They don't provide counseling to human subjects. That is, they're not essentially, you know, if human subjects don't give them a call and say, you know, I'm interested in participating in this clinical trial, what do you think? Or can you review the informed consent document? They don't do that. But they write articles, they attend conferences, they communicate with sponsors and PIs, and they collate data so that they can file petitions, essentially, to ensure the protection of human subjects. If we were to view petitions as advocacy as opposed to service, you know how our extending law has this distinction between advocacy, which would include lobbying, and I think your brief says that's all it should include. But I think our cases have looked at it more broadly. Lobbying, litigation costs, perhaps administrative advocacy. What would you point to that's outside of administrative advocacy, litigation advocacy, lobbying on your issues that's more in the service side of things? Well, again, with this issue, advocacy, I believe the phrase and the opinion is pure advocacy. We'll have to come to a legal decision about that, but I'm asking you as a record matter, as a matter of the activities of the organization, what would you characterize as the most sort of service-like as opposed to advocacy-like? I think participating in conferences, communicating with PIs and sponsors, writing articles. Has any of that been impaired by the denial of your petition? Excuse me? Has any of that been impaired by the denial of your petition? Certainly. She has said that we have one essentially full-time employee. Well, you made a choice how to allocate your resources, but did the agency's denial of the petition prevent you from doing any of those activities? Did it prevent you from doing any of those activities? But what she did was the- Just to be clear, did it prevent you from doing any of those activities? There was no injunction that we shouldn't do those activities. It didn't operate on you in any way. But we devoted our resources to what we considered the most important thing to do, which is let's communicate. Let's do what the FDA should do, which is essentially communicate. But the FDA's own position is that animal studies are not a predictor of safety or efficacy. So it turned out that you had filed this petition, but it wasn't your most important thing, and that in fact attending these conferences and writing articles on different subjects was much more important to you and your board or whatever your group of decision makers. And so you're like, oh, well, too bad. I wish they had granted the petition, but they didn't. We'll post something about it on our website, but we're going to go forward and keep doing the other things that we think are even more important. If that had happened, so if you all had made a different resource decision, there were other things that were just more pressing to your interests and concerns, would you have been injured? If it didn't hamper us. In other words, if we just- If you had made a different decision in response to the petition. The petition was denied, and we said, you know, we don't really care. So we're just going to go on about our business. Because we don't care, but it's not our top priority. If it didn't change our daily activities, then you're correct. Then there's no injury. That's the whole point of it, that you've got to essentially show that your daily activities were hampered or hindered. This was important. It was the important thing that this particular organization wanted to- One of your missions is to educate people about human research projects, correct? Correct. I think you began this argument saying that's one of your missions. That's correct. So what you're doing is just executing your mission. How's that- You're not interfering with your ability to execute your mission. Because there was a specific focus on that particular issue. This organization for a long time has been focused on whether or not animal studies are predictor of safety and efficacy. And if they're not, and if they're not, then human subjects who enroll in clinical trials and are told, oh, don't worry, we've done this, we've done animal studies, would show safety. So you don't have to worry about it. Your mission is to get this information out there. Our mission- The government didn't help you. Our mission is to make sure that clinical trials are conducted in an ethical manner. I thought you said your number one thing right now is to make sure people knew about this problem. Is that not- I thought- maybe I misunderstood your answer. I thought you said that's what you've really been focused on. That's correct. Is getting this- That's correct. And who has standing to challenge this but the Senate? Who knows? Because if the humans- I mean, obviously human subjects would have standing. But as soon as they know, as soon as they learn that animal studies are not a predictor, they have no case. So you have more rights than individuals because you know as well. We know. That's right. We know. So an individual could not bring this lawsuit but you can. Individuals could bring a lawsuit if they didn't know about it, but of course they wouldn't know to bring a lawsuit. Right, but you know about it and you still get to bring a lawsuit. Correct. But individuals couldn't do that. Well-  Correct. Tamara Drake couldn't do what you're doing. I believe that the center and other public advocacy groups who are involved in protecting human subjects are really- I'm just asking the question that Tamara Drake couldn't bring this lawsuit. It has to be the center. The organization has to bring the lawsuit. Either this organization or other organizations- Because organizations have greater standing than individuals. Well, I mean, if you had- you could have members of the organization who could have standing as well. Well, you said that wouldn't work here because as soon as they bring the lawsuit, they already know. They'll have the information that they need to know and so then they won't have standing. That's right. And you know, there are drug companies and individuals who work for drug companies who work with the organization. Now, if they also know that animal studies aren't a good predictor, then they don't have standing because in their informed consent documents, they're going to include the comments, the risks that, okay, look, we've done animal studies, but these aren't good predictors. You know, in a famous case that I had involving a human subject, the human subject didn't know that the animal studies were not a good predictor. Mr. Milstein, if the FDA had granted the petition, how would your activities be different going forward? If the FDA had granted the petition and therefore this was consistent with their guidance and informed consent documents, then we would continue doing other things to ensure the protection of human subjects, particularly the idea- and we list five or six other things that we would have done, but one thing that we're focused on at the moment is the transparency. That is, it's unclear to the public how many deaths there have been of human subjects in clinical trials. It's unclear to the public how many- if you wanted to know how many animals are in preclinical experiments, you can find the data to the mouse, to the monkey, to the dog. But if you were asked how many human subjects are there in clinical trials, there's no data for that. So you're collating that information, and when you talk about the things- when I was asking you about the service activities as distinct from advocacy activities, you mentioned attending conferences, and who does that serve, to attend conferences? It depends on the conference. What I'm looking for is, given our case law that distinguishes between advocacy activities and service activities, some of the things that you had identified as not advocacy, like formulating petitions to agencies, I'm not sure that our case law treats those as something other than advocacy. So I'm looking for things that are more in the heartland of non-advocacy service-type activities by your organization, and the things that you had mentioned was attending conferences and communicating with principal investigators and sponsors. And so in the latter category, who is it- what's the service that's being provided? Or is it an advocacy form to say we want these people to accept our position? Well, again, I think that phrase in the case- in the cases you're talking about, this issue of advocacy issue, is whether it's pure advocacy. Right. I understand that, and that's why you briefed it, and that's a legal question. And it's our position that that is only law. But I'm just asking you to help me. I'm asking you to help me. Let's say I totally agree- maybe my two colleagues don't, and they think advocacy is broadly defined. I'm just asking you to help us understand how strong the record is for you and how to understand what you claim is impaired in terms of your activities that doesn't even arguably fall in that advocacy domain. And you're fighting the question, but it would be helpful to know. Well, I think it's all the same thing. By articles, by peer-reviewed conferences, and by essentially collating data, what you're trying to do is gather the information so that you can talk to those who are involved in clinical trials, whether you're talking to IRBs, whether you're talking to sponsors, whether you're talking to principal investigators, when there are a number of organizations of individuals who are involved in clinical trials. And you can go to those conferences, you can be a speaker at those conferences, and you can say, look, the FDA agrees with us that animal studies aren't a good predictor. I mean, it's not as if we're advocating a position that the FDA doesn't agree with. The FDA agrees with it. In a way, I mean, on the merits, and that's obviously not the standing question, but the merits question, on the merits, the FDA says, yeah, nothing in the- we fill out chapter and verse exactly what investigators have to tell subjects, because it's very situational. And we're not going to change that practice just with respect to this issue. It doesn't make sense to have a cookie-cutter set of requirements on the gap between how animals respond to testing and how humans might respond. We don't do that. We have a much more flexible requirement that the investigators give an equal consent. And so to hear if there is an issue of, you know, misleading information about how safe animal test results suggest human tests are going to be, nothing in our rules says you don't have to provide that. So I don't think- I think you're overstating that they don't disagree with you on the merits. They kind of do. They're saying- Everything the FDA writes agrees with us on the merits. They have a guidance situation. They have some statistics, and they recognize there's a gap. But how that applies in individual trials is more nuanced, is their view. Well, my specialty is representing human subjects who are injured in clinical trials. I've read hundreds of informed consent documents. I've been involved in a number of cases with individuals where the representation was made in the informed consent document that the animal studies were conducted and the animal studies demonstrated efficacy and or safety. But there's never, never- I've never seen an informed consent document where animal studies are essentially included as something that tries to induce the human subject to participate. That human subject- be aware that animal studies are not necessarily a good predictor. So don't rely on the statement that animal studies showed it was safe. Because, for instance, there are certain conditions that can be caused by psychotic drugs to treat psychoses or seizures that essentially start to destroy the brain. Animals don't suffer from those. Can you tell me how you distinguish food and water? Because I understand your argument to be since the FDA won't do it, we're going to have to educate people about this problem. That's why you're dedicating all these resources to addressing this problem. So how does that distinguish food and water? Where they said, well, now we're going to have to educate people about this agriculture approval, USDA approval here, not protecting their safety, their food safety. Well, again, food and water watch was a case on the summary judgment stage, not the motion to dismiss stage. And so there was a question as to whether- I'm talking about the nature of the injury, though. They said they would have to go educate the public, and you say you have to go educate the public. But there was discovery that took place between this motion to dismiss stage and the summary judgment stage. And the plaintiff in that case could not show that its resources were essentially either hampered, inhibited. You could argue that it was going to now have to be spending all its resources on educating the public. But they didn't demonstrate that they had, as soon as the denial was, or as soon as they knew about it, that they had actually diverted and- And our opinion of food and water watch said, oh, if you had shown us that you were spending 100% of your resources on educating the public, the outcome would be different? I didn't read it as an evidentiary insufficiency, the analysis in that case. That's how you read it. But I don't think it's at 100%. I think you have to divert-essentially, your daily activities have to be inhibited. And the plaintiff in that case could not demonstrate that its daily activities, one, could be inhibited, and that doing so essentially addressed the problem. So food and water watch had said we're now going to have to spend a majority of our resources on educating the public. Then they would have had standing. If they had said that we are spending, we are spending now. We're going to have to. I don't think there was- Substantial risk. It was either that case or another case that said it was speculative as to what you were going to do. It wasn't speculative about here's what we're going to do. You haven't started yet, so you're hoping we'd win this litigation. I think you have to do it. You simply don't say this is what I need to do. I think you have to do it. And the center did do it and is doing it now. So saying you're going to have to do it isn't sufficient. So if you filed your complaint at this time before you actually started compiling that information, you wouldn't have made the showing that's needed for an injury. You actually had to have been doing it at the time you filed your first complaint. Well, we certainly were doing it, even as the petition was pending, because you had asked the question. You started to compile the statistics. No, I'm talking about the compiling. I think there was two compilations going on. One was the statistics. There were two compilations. One was information about people. That's right. But even the compiling of the statistics was essentially part of what we were doing. Yeah, but you're not relying on them. I'm talking about compiling the information to contact either listeners or subjects. But I'm relying on both because there was there. I thought you had long since given up reliance on the first as a basis for standing up. What we said was, what we said to the district judge was, no, we had started to do that before even the denial. That's what we were doing even before the denial. But then as soon as the denial came, then or subsequent to the denial, we started to compile the names of these so we could contact them. That's the difference. Anything else? All right. I think I've reserved two minutes. Thank you. Good morning. May it please the Court. Jeff Sandberg for the United States. The theory of standing that plaintiff advances on appeal is flawed for multiple reasons, all of which I think have been suggested by some of the questioning of my opposing colleague. Most immediately, I think it's important to note that plaintiff's theory of standing, if it were accepted, would mean that any advocacy organization or, indeed, any concerned citizen, could obtain standing to challenge government action with respect to virtually any policy dispute or generalized grievance, because the theory seems to be that if the government fails to adopt a particular proposal for how to regulate third parties, for increasing regulation on third parties, a plaintiff group can then undertake modest efforts like sending unsolicited emails to try to persuade those parties to adopt the idea voluntarily and then argue that that activity has injured the plaintiff insofar as it has chosen to divert resources away from its other advocacy campaigns. So the colloquy with my opposing colleague started and focused a lot on the timing of when exactly they had started to compile the clinical investigator's information, and it was correctly established that there was no allegation that that had happened months before May 10th. But the more important point is, even if they had started doing this years before, what they were engaged in was advocacy. They were engaged in a letter-writing campaign to persuade third parties to do something that they think is a good idea. And regardless of the timing of that effort, that is an advocacy effort, and they chose to prioritize that over their other advocacy campaigns. I think the one question you asked about in which my opposing colleague acknowledged there would be no standing if the participation on committees or the transparency petition were more important to them, I think illustrates that the standing theory is no good, because standing can't turn on what is subjectively most important to an advocacy organization or what its priorities are. There needs to be a harm to the organization's activities. So this is an organization that files citizen petitions. If, for example, the FDA had said you now have to pay... Well, part of what we do is educate the public, and it's going to take a lot more resources to educate the public because you're not helping to educate the public, giving us the information that would make it easier to get this message across to the public. And it certainly sounds a bit like PETA, doesn't it? No, I don't think so. I don't see anything in... Well, first of all, there's nothing that FDA did here that made it any more difficult for them to educate the public about the limits of animal testing or therapeutic misconception or anything else. FDA did not make the task any harder. And in PETA, PETA was in part an informational standing case, which this case is not. It's really important to note right from the get-go. Nobody here is claiming that their harm is that they've been deprived of a flow of information that should be coming to them. That had been pled as a theory in the original complaint here, and that was dismissed for reasons that you had discussed or my composing colleague had discussed previously, which is that the plaintiffs already... Sort of the anomaly, the plaintiffs already knew the information that they were claiming they had been deprived of. But this is... And the other basis for standing in PETA was that an avenue of redress, the ability to file complaints with the agency, had been cut off. Here, there's been no allegation that any avenue of redress has been cut off. Plaintiffs and other organizations and individuals remain able to file citizen petitions with the agency, conduct whatever outreach that they think is appropriate. Although it wasn't cut off. It wasn't something that was there before in PETA, right? We're talking about the failure of the Animal Welfare Act regulations to cover birds. So it wasn't that there was something that was taken away. It was that there was an understood need, and PETA tried to get the agency to respond. It didn't. And this Court recognized that following that denial, that it put the organization in a burdened position. So I'm just getting at the very first point you made about the timing and whether an organization that responds after the agency fails to take up the cause the way they think it should, whether that post-petition denial effort can ever give rise to standing. And it seems like, at least implicitly in PETA, that, as you say, the cutting off of the ability to file complaints, it's really they're experiencing it after the denial, but they didn't have it before. So that arose, in a sense, or was articulated as a burden after the denial. And I guess the broader, I mean, I will let you respond. The broader point is there are issues that really only crystallize, that people realize are problematic, entities, organizations realize are problematic, and they try to get the, you know, what they think is maybe the efficient response from the government. If the government turns them down, they will turn and try to do it themselves. And there are a lot of, you can't say, well, they don't have standing because they weren't already doing it before. Or can you? Is it your position that standing has to be limited to exclude burdens of that form? Well, I think it's sort of a blended question of, or at least in this case, lots of blended question of injury and causation there. And I think here the timing, at least in my mind, goes mainly to the fact that the original complaint had been dismissed, and then they start undertaking the outreach to clinical investigators. There's nothing in the record that says that they didn't start compiling the information, which is going to, to be clear, going to a government website, clinicaltrials.gov, and copying and pasting information. It appears that it may well have happened after the dismissal of the original complaint. And the district court here suggested that it may well have been in anticipation of litigation. And that is a line that this court has suggested in past cases is one that, you know, can't be crossed. If it really seems that the most plausible reason that you're doing this is to create a pretext for litigation, then it's probably not likely that the defendant's action caused, in the Article III sense, the plaintiff's injury. Judge Pillard, I take your point that just leaving the status quo as it is doesn't mean that the plaintiff must lose. Otherwise, a denial of a rulemaking petition would never be reviewable by a court, because the agency just leaves the world as it finds it, right, when it denies. But, of course, there are cases in which denials of rulemaking petitions are reviewable, Massachusetts versus EPA being one. The point here is that the activity that they are engaged in is advocacy to third parties about how they think they should conduct their behavior and be regulated by the government. And if you accept that theory of standing here, you are giving standing to any concerned citizen, because the test for organizational standing, Havens itself says that. He said citizens don't have standing, it's only organizations. He says that, but the case that spawned this whole inquiry, Havens has said, the test for organizations is the same as the test for individuals. That is a lodestar that this court should mark again if it's not clear enough already. And I think any advocacy organization or any concerned citizen who feels strongly about an issue, that pharmaceutical companies should charge lower prices or that coal power plants should emit less pollution, can just start contacting those third parties and saying, I want you to do this thing, and then ask the government to mandate it. When the government says no, say, well, now I can't go to my local PTA meeting because I'm so busy emailing coal power plants about pollution. And I just think that can't be enough. What role does the sort of the third party education or communication play? I mean, for example, if I were running Habitat for Humanity and I was worried about beach erosion and I tried to get the relevant Department of the Interior to deal with it, they denied my petition. And instead of building homes in this island community, all the volunteers had to start building levees or doing some other work. It would be voluntary. It would be in response. But I take it you would think there was standing there. And so what is it about that? I'm not prepared to take a position on those facts. I would need to know more about it. Your question before Judge Pillar pointed out that in many of this court's prior cases that have found organizational standing, there were services provided by an organization where you're helping connect minority would-be homebuyers or would-be renters to housing, or you're helping connect people to employment. The organization folds itself out to the public as a provider of services, and the public comes to them. And in many of those cases, the plaintiff organization was suing a defendant that was directly lying, was engaging in racial-steering practices, and made the plaintiff organization's services-giving more difficult. But as was established previously, this is just an advocacy organization. It interfaces with the government, and it's a laudable thing. The agency appreciates that people bring their suggested good ideas to the agency. But we think that dialogue, that give-and-take, is for the policy process and that courts don't have a roving commission to come in and revisit every policy determination that was made. How would you respond if opposing counsel said, we're providing a service to human subjects in drug research because we're contacting principal investigators and we're urging that they give better informed consent to human subjects and tell them about the gap between how animals and animals behave? Setting aside that they haven't alleged it that way, I just think that wouldn't plausibly count as a provision of services to clients or customers. That is advocacy for the benefit of third parties who you have no relationship with. And you're right that this court's case law suggested that advocacy goes beyond lobbying to include administrative give-and-take with the agencies. The Turlock Irrigation District case made that clear. And I think Food and Water Watch, fairly read, suggests that also educating the public at large in sort of a vague, unsolicited way is well read as not a harm to the organization's activities or you can conceive of it as it's just a harm to advocacy if the defendant's action inspires you to speak more forcefully or more broadly about your good idea. How do you distinguish PETA then? They're saying the information here is notices to subjects. So PETA's worth focusing on because I do think it is the high watermark of this court's organizational standing case law in terms of permissiveness in recognizing standing. But there's still two things that were present in PETA that are not present here. One is the cutting off or not allowing an avenue of redress to the agency. Not generating information to the public. And then not generating the inspection reports, that's right. Well, not generating information to the public that then the entity was going to have to generate to the public. No, well, importantly, it was not generating information that the plaintiff itself needed, allegedly needed to do its job here. Wanted. Wanted, wanted. Here, the plaintiff advocacy organization isn't saying I'm thinking about participating in a clinical trial and there's something I need to know as CRS before I sign up to have, you know, these drugs injected. PETA's not birds either, so they weren't going to be subject to the treatment issue. Yeah, but their activity was they wanted to file complaints with the agency and there was information they needed for it. And they're not saying that the agency's depriving them of information they need. They're not saying clinicaltrials.gov needs to have contact information that's not there. They haven't, in this case, said FDA is not compelling agencies to publish data about adverse effects during clinical trials. The informational injury, if there is one in this case, is one that would be asserted by somebody who's thinking about participating in a clinical trial but isn't getting the information he needs to know. And the problem with the case that's fled in the original complaint was that the plaintiffs knew the very information that they were saying they hadn't been given, which is that there are limits of animal testing. But in another case, you know, involving a different informed consent matter, you'd say, look, I don't think, I think FDA should require that clinical trials provide, you know, detailed physiological, you know, diagrams of the molecules that are going to be involved in this clinical trial. And that's not something you would know already, right? So if your theory is I have a right to see diagrams of the molecules that will be used in the clinical trial, FDA, by law, is required to make that information public or compel studies to make that information public. You would have, that would be kind of what an informational injury claim would look like in this context, and that's not what the plaintiff has presented. But that sort of bleeds into the merits. So what is your position on the merits? You didn't move to dismiss on the merits below? We didn't. We thought it was clear enough that the plaintiff lacked standing. We didn't waive our ability to argue that the, you know, the agency reasonably denied the rulemaking petition here. And certainly if this case were remanded for any consideration of the merits, we would promptly seek dismissal on that basis. Did you say probably or you would promptly? I said, well, maybe both. Probably promptly. I shouldn't speak for my colleagues in the consumer protection branch. All right. Thank you very much. Thank you. Hang on, Mr. Milstein. I think we're out of time. All right. We will give you two minutes. Sorry. I didn't mean to cut off your fire there. One difference between this case and some of these other cases is that the FDA's own regulations, 21 CFR 10.5, say an interested person has standing to essentially seek judicial action. Now, we recognize that the FDA regulations don't essentially confer constitutional standing. But the point is that my client is in a different position than just the average person. They are an organization that has a lot of information. When they supplied the petition, they supplied all kinds of data to show that it's not just that, as counsel says, well, gee, you need to identify the molecule. You know, the problem is that the representation that animal studies should essentially convince an individual that the drug they are being subjected to is safe, that representation may be false. That animal studies are not a good predictor. And all we're saying is human subjects deserve to know the truth in order to have consent that is informed. Now, you distinguished food and water watch on the ground that it was summary judgment. But at page 913 of that opinion, we held that we were applying the motion to dismiss standard. And we took all of their allegations as true. So how else do you distinguish food and water watch? Well, I distinguish it one way because, again, I think that this drug situation, with respect to clinical trials, is in a different context. The FDA wants... How is your injury different than the injury suffered by food and water watch? The injury is... Your injury. Your injury. Our injury is different because we are not just planning to. We have... We credited in holding that they had an established standing, that they had not made a plausible allegation of standing. We credited their allegations, which were that we're going to have to now educate the public. And in our case, we have, both before we filed the petition and after we filed the petition, began the process of essentially collating all of the clinical trials that are being conducted. Well, if you were doing it before they denied the petition, then I don't know how it's injury inflicted by the petition. Because that led into... Okay, now we've got a real problem because the FDA is not going to do what we want them to do. So now we've got to not only just develop the data of who is being harmed, how many deaths there are. Oh, I'm sorry. I think we keep talking about different information. Are you arguing that before they denied the petition, you were also compiling the information about who's doing this research that we need to notify? No. Okay. Before the petition was denied, we were compiling information that had no transparency about deaths. About deaths. And that led into... Now we've got to essentially find out who was doing the clinical trials, who could we contact, and how we can address the situation. If they had granted your petition, but had not... You had three paragraphs you wanted them to include, right? Yes. You had three paragraphs. And they said, well, we're going to grant your petition part, but we're going to only put in our regulations paragraph, which you have. That's the first paragraph. And not the second two paragraphs. If they had done that, would you be injured? If they didn't essentially adopt exactly what we asked for, but in essence said, told those who were going to be human subjects not to rely on animal studies. Here's the question. They put in your first paragraph, right, which includes a line, due to differences between animals and humans, animal tests may not predict. They didn't put in your second and third paragraphs. We would not have been injured. So you don't think that you need to tell the public about what's in the second and third? It would have been helpful. But as long as you alert human subjects, hey, don't rely on the fact that there are animal studies as an assurance that this is a safe drug, I think we wouldn't have had standing to then contest that you didn't do two and three. We would work with the FDA. Okay, so if they had granted your petition but put the second paragraph in, or the second and third paragraphs, then you would be injured? I mean, as long as the essential information in any of the paragraphs, that animal studies are not a good predictor of safety and efficacy, we wouldn't have been injured. And you said the FDA agrees with you on this problem? Correct. And has the FDA put statements out about that? Absolutely. So the information is already out there for human test subjects? Well, the information is out there for sponsors, for drug companies, and for PIs. But is it in informed consent documents? PI? I'm sorry, what's a PI? Principal investigator. But is it in there for human subjects? No. Is it publicly available? It's absolutely publicly available. But the human subjects read the CFRs before they decide to participate. My experience with the number of – Is it in the – it's not in the CFR, is it? Excuse me? It's not in the regulation, is it? Is it in the regulation already? It's in the guidance. It's in the guidance. It's certainly on the FDA's – I think it's on the FDA's website. Do human subjects know to go there to see what's there? No. Because of the therapeutic misconception – Well, if you could just put on your own website, please, if you're going to be a human test subject, please see – We can certainly do that. Please see this part of the website. Absolutely. Absolutely. That wouldn't take all your resources, either. But do human subjects look at that? I don't think so. I mean, certainly in the experience I had, human subjects go in there. They rely on the principal investigator who's wearing this white coat. They consider that person their doctor, generally, not the scientist. They don't consider themselves a subject. They consider themselves a patient. They don't understand that they're in an experiment. They think they're getting therapy. That's the whole concept of the therapeutic misconception. That's why human subjects need to be fully informed before they participate. Thank you very much. Thank you very much. The case is submitted.
judges: Millett, Pillard, Wilkins